RAMADA DEVELOPMENT COMPANY, Plaintiff-Appellee,

v.

Martin W. RAUCH et al., Defendants-Third Party Plaintiffs-Appellants,

J. Stewart Stein, Third Party Defendant.

No. 78–3773.

United States Court of Appeals, Fifth Circuit. Unit B

May 14, 1981.

Rehearing Denied July 7, 1981.

Richard H. Frank, Mark F. Kelly, Tampa, Fla., for defendants-third party plaintiffs-appellants.

Carlton, Fields, Ward, Emmanuel Smith & Cutler, P.A., Edward C. Adkins, James M. Landis, Tampa, Fla., for plaintiff-appellee.

Before TUTTLE, RONEY and VANCE, Circuit Judges.

TUTTLE, Circuit Judge:

On December 13, 1972, Martin Rauch signed a contract in which the Ramada Development Company agreed to design, furnish, and construct a 160-unit Ramada Inn Motor Hotel and Restaurant in Venice, Florida. The contract allowed for progress payments, and disbursement of progress payments were made by Rauch's lender, First Federal Savings and Loan Association of Sarasota.

The construction was commenced shortly after the signing of the contract. By January 25, 1974, the construction of the motel was, according to one witness, "substantially complete" in accordance with the construction contract. "Substantial completion" as defined in the "specifications," meant the project was sufficiently complete for Rauch to occupy all or part of the motel. All that remained for completion were the "punch list" items—a list of defects compiled by Rauch and given to Ramada. Rauch occupied most of the motel—using the restaurant and renting rooms. A Ramada construction report indicates that on February 1, 1974, Rauch made a spot inspection and was "very pleased" with the motel and had "no complaints." The motel was furnished, and the inn supplies were substantially on the premises. But at some time Rauch became dissatisfied with the motel or the furnishings and supplies. Although the contract demanded that the final payment was due upon "substantial completion," Rauch admittedly refused to make the final payment. According to one witness, Rauch refused to endorse the lender's check that was jointly payable to Ramada and Rauch. Rauch claims that he refused to make the final payment because he was not yet satisfied with the work while Ramada claims that by that time Rauch had not made any complaints beyond the usual "punch list" items. On February 19, Ramada's representative responsible for correction of "punch list" items left the project to the subcontractors who had agreed to complete the punch list work.

With the final construction payment stopped and the contract balance for the furnishings and inn supplies unpaid, the present dispute crystalized. On January 31, 1975, approximately one year after Rauch occupied the motel and refused to make further payments to Ramada, Ramada brought this diversity action against Rauch for the balance due under the contract for the construction, furnishing and supplying of the motel.[1] Ramada sought to establish a lien on the property and asked that, in event of Rauch's failure to pay the lienable amounts owed, the court foreclose upon the property. The defendant answered, denying liability and alleging a counterclaim against Ramada for failure to perform according to the contract and for negligence in planning and construction of the project.[2] In addition, Rauch denied that Ramada had satisfied the statutory prerequisites for the establishment of its lien claim.

Beginning on September 5, 1978, the main claims and the counterclaims were tried to a jury. In answering a set of special interrogatories, the jury, on September 22, 1978, gave a verdict that was basically favorable to Ramada. The jury found that Ramada had substantially performed its construction obligations and should receive $79,902.10 as the final payment for construction. Although the jury found that Rauch was damaged by a failure of Ramada to completely finish the construction work, the jury believed that Rauch should receive no money because he had prevented Ramada from completing the work. The jury further found that Ramada had substantially furnished the motel and delivered the inn supplies as required under the contract. Rauch, according to the jury, owed Ramada $373,933.38 and $73,018.68 respectively as the unpaid balance for those two items. Following this verdict, on November 6, 1978, the district court found that plaintiff had a valid mechanic's lien under Florida law for $288,042.88, plus prejudgment interest of $145,587.21 and attorneys fees of $175,000 also secured by the lien. In addition, the district court ordered the property sold at public auction if Rauch did not pay $470,042.88 to Ramada.[3]

From this disposition by the district court, Rauch appeals. He alleges several claims relating to the liability issue and in addition questions whether Ramada complied with the Florida lien law. We find that Rauch's claims respecting the liability portion of the judgment are without merit. On the other hand, we believe that Rauch's appeal has exposed a problem with respect to the validity of the lien. Accordingly we reverse and remand that portion of the case to the district court for further proceedings.

I. *Liability*

Rauch raises four issues concerning the district court's submission of the case to the jury and one issue regarding excluded evidence.

A. *Requested Charge on Negligence*

Rauch argues first that the district court erred by refusing to give his requested charge on the plaintiff's alleged negligence. The district court charged the jury regarding Rauch's breach of contract counterclaim but refused to instruct the jury regarding negligence despite Rauch's request for a charge on negligence. The district court, after a motion for a new trial, stated that a separate charge on negligence was unnecessary because the duty owed Rauch under the contract was broader than any duty owed under a tort theory and therefore "the negligence claim was subsumed by the breach of contract claim."

■ We affirm the district court. Florida law may recognize the possibility of alternative claims of negligence and breach

---

1. The complaint named as defendants Martin Rauch, Susan Rauch, his wife, and their partnership, Venice Ramada, Inc., Ltd. Martin Rauch appears to be the principal actor of the group, and although those named defendants are all appellants, we will refer to them collectively as "Rauch."

2. The counterclaim also named as third party defendant, J. Stewart Stein, the architect.

3. The Court, on December 1, 1978, amended this amount to $542,638.64.

of contract under circumstances such as are present in this case.[4] Such authority, however, does not necessarily control this question. Rauch draws his primary support from *Ajax Hardware Manufacturing Corp. v. Industrial Plants Corp.*, 569 F.2d 181 (2d Cir. 1977). The *Ajax* court found error in a district court's dismissal of a negligence claim that the lower court felt was " 'completely merged in the alleged breach of contract.' " *Id.* at 185. Rauch offers no additional authority for his position and stands on his claim that he is entitled to submit to the jury any legal theory sufficiently based in the evidence. This proposition, although attractive, cannot mean that the district court's refusal to instruct on negligence constituted reversible error. All relevant facts were submitted to the jury. Any duty owed Rauch arose out of the contract and the jury found that Ramada had not breached its contract with Rauch. Any negligent tort committed by Ramada would necessarily have been a breach of the contract. *Cf. Richardson v. City of Conroe*, 582 F.2d 19, 19–20 (5th Cir. 1978) (not reversible error to refuse to charge jury that police officers would be liable under § 1983 for "constitutional torts" of gross negligence where court also charged jury that officers could not be liable for their actions in good faith). And the jury decided these factual issues against Rauch. Indeed, Rauch has failed both in his brief and at oral argument, to describe any prejudice resulting from the district court's refusal to submit a charge regarding a distinct legal theory that is applicable to the nucleus of facts before the jury. In some cases, the withholding of a charge of negligence may make a difference. For example, actions constituting a breach of contract may also constitute a tort for which punitive damages are recoverable, *see Nicholas v. Miami Burglar Alarm Co.*, 339 So.2d 175 (Fla.1976), or a contract action may be time barred, whereas the tort statute of limitations may

be unexpired, having begun to run at a later date. *See Victorson v. Bock Laundry Machine Co.*, 37 N.Y.2d 395, 373 N.Y.S.2d 39, 335 N.E.2d 275 (1975). The *Ajax* court faced a situation where the availability of a negligence theory did potentially make a difference. Judge Oakes, in a concurring opinion, noted that the reinstatement of the negligence claim made possible an award of punitive damages. 569 F.2d at 187. Rauch's inability to point to any such material prejudice from the district court's actions convinces us that we need not reverse the district court.

B. *Instruction on Prevention of Performance*

Rauch next claims that the district court incorrectly instructed the jury on the issue of prevention of performance. The district court submitted to the jury interrogatories permitting a finding that if Ramada failed to fully perform its part of the contract, the jury might still consider whether Rauch had prevented completion of the contract. *See generally Nitron, Inc. v. M/V Cretan Life*, 599 F.2d 1359, 1371 (5th Cir. 1979); *Ballard v. El Dorado Tire Co.*, 512 F.2d 901, 907 (5th Cir. 1975). On this issue, the district court instructed the jury that:

> So in this case, if you find from a preponderance of the evidence that the Plaintiff, including Plaintiff subcontractors, was ready, willing and able to perform its contractual obligations, but the Defendants did something which effectively hindered, obstructed or prevented the Plaintiff from so doing, then the Defendants cannot recover damages *for that failure*, because they, themselves, became charged under the law with responsibility for it.

> • • • • •

> To recapitulate for a moment, if you find that the Plaintiff substantially performed the construction portion of the

---

4. *See Forte Towers South, Inc. v. Hill York Sales Corp.*, 312 So.2d 512 (Fla.Dist.Ct.App. 1975); *Nicholas v. Miami Burglar Alarm Co.*, 339 So.2d 175 (Fla.1976); *Holbrook v. Sarasota*, 58 So.2d 862 (Fla.1952); *Parliament Towers*

*Condominium v. Parliament House Realty, Inc.*, 377 So.2d 976 (Fla.Dist.Ct.App.1979). *See also Sea Lodge Properties, Inc. v. Dodge*, 283 So.2d 55 (Fla.Dist.Ct.App.1973).

work, and you also find that the Defendants nevertheless sustained damages from a lack of full and complete performance of that work, and if you further find that the Plaintiff was not prevented *by any action* on the part of the Defendants from accomplishing full and complete performance of the work, you will then consider the next issue, namely, the amount of the damages sustained by the Defendants.

(emphasis added). Rauch contends that these instructions potentially confused the jury "as to whether [he] must have fully prevented Ramada's completion of the contract in order to have been denied recovery, or whether a *single act* which might be deemed to constitute prevention of some portion of Ramada's performance would bar [him] from any recovery." This instruction entitles him to a new trial, Rauch claims, because it allowed the jury to find that prevention of performance of one obligation excused performance of all other obligations.

■ Rauch admits that he failed to object to the instruction in question. This Court must therefore review the alleged error under the plain error standard. *See, e. g., Bissett v. Ply-Gem Industries, Inc.,* 533 F.2d 142 (5th Cir. 1976); *Wirtz v. International Harvester Co.,* 331 F.2d 462 (5th Cir. 1964).

■ This Court, after such review, concludes that the district court did not commit plain error in the challenged instructions. Rauch's interpretation of the instruction is plausible in the sense that some language does not completely foreclose his construction that any prevention excuses all obligations. On the other hand, the instruction, taken as a whole, more naturally could be read as excusing only those obligations with respect to which there was prevention. The second quoted paragraph contains the language offensive to Rauch. This paragraph, however, is merely a general summation of questions on this point to be answered by the jury. The first quoted paragraph clearly instructed the jury that prevention of performance only disallowed "damages for

*that* failure." (Emphasis added). The second paragraph merely gave the jury an overview of the pertinent questions in the broader context. This latter paragraph clearly was not intended as a substitute for or refutation of the prior, more specific instructions. Rauch's complaint turns on his view that the instructions were not perfectly precise. The district court obviously could have fully answered the complaints raised by Rauch if it had inserted in the second quoted paragraph one additional modifying phrase that made clear for a second time that a specific failure of performance was excused only if it in particular resulted from prevention. Although the instructions perhaps were not perfect, they nevertheless do not constitute plain error because they conveyed in a broad fashion the analysis acknowledged by the appellant to be correct.

### C. *Sufficiency of Evidence of Prevention*

Appellant-Rauch next launches an attack upon the district court's submission to the jury of the issue of prevention. Aside from the propriety of the instructions, he claims that the prevention issue should never have been submitted to the jury because there was no evidence that he prevented Ramada's performance.

■ Rauch concedes that he did not raise this issue as a ground for a directed verdict. It is thus reviewable under the plain error rule which limits appellate review to whether there was a manifest miscarriage of justice or whether *any* evidence was introduced on this point, without an examination of the sufficiency of that evidence. *See Little v. Bankers Life & Casualty Co.,* 426 F.2d 509, 511 (5th Cir. 1970); *House of Koscot Development Corp. v. American Line Cosmetics, Inc.,* 468 F.2d 64, 67, 68 nn.4, 5 (5th Cir. 1972); *American Lease Plans, Inc. v. Houghton Construction Co.,* 492 F.2d 34, 35 (5th Cir. 1974). In addition he raised this point in his motion for a new trial and the subsequent denial of a new trial. This latter motion may also allow this Court to determine whether the district

court abused its discretion, *Little v. Bankers Life & Casualty Co.*, 426 F.2d 509, 511 (5th Cir. 1970) or there was an "absolute absence of evidence to support the jury's verdict." *Fugitt v. Jones*, 549 F.2d 1001, 1004 (5th Cir. 1977); *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 297–98 (5th Cir. 1978). *See Urti v. Transport Commercial Corp.*, 479 F.2d 766, 769 (5th Cir. 1973).

The plaintiff, of course, maintains that it introduced substantial evidence that Rauch prevented completion of the contract. This evidence consists of several instances where Ramada believed its job was made more difficult by Rauch's actions. Dan Smith, a witness for Ramada, testified that the work was completed but that "several items on the punch list at the end of the project were not completed" because of the actions by the occupiers of the motel. To establish this pattern, he offered, as examples, two instances—one involving a dry wall subcontractor and another involving an electrician—where subcontractors sent workers to the project but admission was refused. In response to a question by Rauch's counsel, this witness stated that one subcontractor reported to him that "the owner refused to let 'em do the work." The electrical subcontractor later testified that he was refused admission to the project because Rauch, who was then in Buffalo, would not allow contractors to come onto the project unless he was there. The dry wall subcontractor also testified that his crew was denied admission but his further explanation was excluded following Rauch's hearsay objection.[5] In addition, John Scales, Ramada's employee in charge of completion of the punch list items testified at his deposition, which was published to the jury, that Rauch had occupied a portion of one building and all of another without permission of Ramada. These buildings still contained numerous items to correct and the occupancy of rooms by guests made this corrective work very difficult.[6] In another deposition read to the jury, Cal Piper, Ramada area supervisor, another witness, agreed that the unauthorized occupancy by guests made it "nigh impossible" to correct defective items noted by Rauch. This witness described sharp disagreements with Rauch over the inconvenience of the occupancy. Finally, on March 10, 1977, long after the present dispute arose, Rauch by his own response to request for admissions, which was read to the jury, "refused permission for Plaintiffs' employees to perform work on the [motel]."

Rauch attacks this evidence. He points out that the electrical subcontractor never attempted to return to complete the work when Rauch was present. In addition, he notes that he denied the contention of the dry wall contractor that he had prevented the crew from gaining admission. In response to the testimony that his unauthorized occupancy of some areas interfered with the construction, Rauch contends that: 1) he agreed to let the contractor barricade certain areas; 2) his occupancy was authorized by Ramada; 3) no Ramada representative instructed him not to use the motel; 4) one Ramada witness did not feel hindered by Rauch's actions; 5) locking out of workmen of some rooms was to prevent theft; and 6) access to any room was provided on request.

Rauch, however, fails to perceive that his arguments do not fully meet the evidence offered by Ramada. We need not refute each of his contentions separately.[7] The

---

**5.** Rauch's counsel objected to this explanation on hearsay grounds. But before the objection some of this testimony had been already received.

**6.** Aside from the inconvenience of having guests in the rooms, this witness indicated that unauthorized occupancy of a portion of a project results in idle laborers and supervision problems. Also, once a room was occupied by guests, the contractors' keys would no longer open the door and master keys must be bor-

rowed from the owner, resulting in additional inconvenience.

**7.** One specific refutation, however, might be useful. Rauch claims that nowhere does it appear that any Ramada representative instructed Rauch not to use the premises, yet there is without question testimony belying Rauch's assertion. Ramada presented deposition testimony indicating that Rauch had occupied portions of one building and all of another building without permission. In fact, Rauch occupied

jury had before it evidence of a pattern of uncooperative conduct by Rauch who by such action could have prevented completion of some of the construction. A dry wall subcontractor was only one worker refused admission, but this was not an isolated incident. In April, 1974, the electrician went to the motel to make a requested repair, and he was denied admission, following Rauch's telephone instruction from Buffalo, New York, in which Rauch ordered that no subcontractors should be allowed on the premises when Rauch was absent. By itself this order may not constitute prevention of performance, but other circumstances cast Rauch's edict in a different light. In the late winter or early spring of 1974, Rauch still had an active law practice in New York. He travelled between Florida and New York in this time period. Rauch would, of course, prefer to convey the impression that he was constantly in Venice, Florida between January and June, 1974, but quite the opposite may be inferred from his testimony. In fact, logic accords with this conclusion, because Rauch at trial testified that he "actively engaged in the practice of law in New York" "until last month or so." Such a practice would demand his presence in New York. Thus, his absences, in conjunction with his orders that no work be done in his absence, likely would have been a substantial inconvenience to the subcontractors who were required to coordinate their visits with his uncertain presence. Moreover, there was reason to doubt whether Rauch would honor any appointments made since Fred Raggett, Ramada Inn Supplies representative testified that in February, 1974, Rauch broke four consecutive appointments, was almost always unavailable and seemed generally uninterested in resolving the alleged problems with the

Inn Supplies. Finally, Rauch admitted that in 1977 he refused Ramada permission to perform work on the motel. These facts, joined with Rauch's uncooperative occupancy, indicate that Rauch made completion of the motel very difficult.

■ Upon these facts this Court cannot say that the record is devoid of evidence of prevention. Because Rauch admittedly failed to question the sufficiency of the evidence on this point in a motion for directed verdict, we need not answer whether the evidence would be sufficient to avoid such a motion based on that ground. But it seems clear that Rauch cannot prevail under the plain error standard which results in reversal only if there is a manifest miscarriage of justice or *no* evidence as the issue was presented. Neither do we feel that the district court abused its discretion in denying a new trial for this alleged error.

Rauch, of course, argues that even if actions discussed above are accepted there is no evidence that he "prevented Rauch from correcting each and every defect in the construction of the motel." Perhaps this assertion is true. But this Court need not consider the question in detail. Rauch offered evidence of serious and trivial, latent and patent defects that could have been caused by carelessness rather than prevention. On the other hand, Ramada presented testimony that the motel was built according to plans and specifications and was of at least average quality. For example, Rauch's witness specifically denied that insufficient steel and concrete reinforcing was used in construction of the walls. Moreover some of Ramada's witnesses testified that some of the defects were either correctable without great difficulty, de

one building despite requests not to do so and despite his promise to honor those requests.

A. Yes sir. He occupied buildings, He occupied Building D.

Q. Was that with your permission?

A. After promising me he would not occupy on the evening that he started occupying.

Q. All right. Was there a reason why you sought his promise not to occupy it?

A. I asked him not to occupy the building until we were totally completed with the punch list items.

Q. What happened?

A. I went to bed. The building, to my knowledge, was not occupied. When I woke up the following morning, it was at least 70 percent occupied.

Q. That was Building D?

A. Yes.

(Deposition of Scales).

minimis, or excusable. There is no reason why the jury would be compelled to believe Rauch's proffered testimony purporting to prove the existence of defects. In addition, given this state of the evidence, the jury had positive evidence of the lack of defects, bolstering our conclusion that it might properly have found that no defects existed or that Rauch suffered no damage from defects, the correction of which was not prevented. If the prevention was slight, the jury might have believed that the defects were correspondingly slight. Even though the verdict is in the form of answers to special interrogatories, the interrogatories were not sufficiently precise to allow an understanding of the jury's belief on this question. Given this veil that covers the verdict we find no reversible error arising from the district court's submission to the jury of the prevention question.

### D. *Instruction on Substantial Performance*

Rauch next argues that the trial court, over his objection, incorrectly instructed the jury regarding substantial performance. The district court instructed that:

> The term "substantial performance" means that degree of performance of a contract which while not full and complete performance, is so nearly equivalent to what was bargained for that it would be unreasonable to deny the contractor the payment agreed upon; subject, of course, to the owner's right to recover whatever damages he has suffered by reason of the contractor's failure to render full and complete performance.

The contract language, states Rauch, goes beyond the definition of substantial performance, given above, and places a greater duty on Ramada. Rauch, thus, contends that the jury instruction on substantial performance should have been modified by paragraph 19 of the General Conditions which read:

> 19. *CORRECTION OF WORK BEFORE SUBSTANTIAL COMPLETION*

> The General Contractor shall promptly remove from the premises all materials condemned by the Owner as failing to conform to the Contract, whether incorporated in the work or not, and the General Contractor, or his Subcontractor, shall promptly replace and re-execute his own work in accordance with the Contract and without expense to the Owner, and shall bear the expense of making good all work of other contractors, destroyed or damaged by such removal or replacement.

The district court, according to Rauch, committed reversible error in failing to take literally the instruction from the contract.

■ Rauch's argument is without merit. The case law supports a definition of substantial performance nearly identical to the one given in this case. *See Ocean Ridge Development Corp. v. Quality Plastering, Inc.*, 247 So.2d 72, 75 (Fla.Dist.Ct.App.1971). In addition, Rauch's requested instructions contain a similar definition of the phrase. In terms very similar to the instruction given, the contract defines substantial performance:

> The date of substantial completion of a project or of a specified area of a project is the date when construction is sufficiently completed, in accordance with Contract Documents, as modified by any change orders agreed to by the parties, so that the Owner can occupy the project or specified area of the project for the use for which it was intended. The General Contractor will determine the date of substantial completion.

The instruction now requested by Rauch does create a greater duty than this definition, but we do not believe that the now-requested instruction directly bears upon substantial performance. Rather, the standard now urged upon us defines the contractor's duties prior to leaving the job—the contractor must correct defects noted by Rauch prior to such time as substantial completion is determined to exist. In any event, the district court more than fully covered any duty arising out of Paragraph 19 when it instructed the jury that:

Thus, even though you may find that the Plaintiff substantially performed the construction portion of the contract, you may also find that the Defendant nevertheless sustained damages because of a lack of full and complete performance on the part of the Plaintiff with respect to the construction portion of the work.

Under this instruction, Ramada was held responsible for any failure to complete the project in a satisfactory manner, regardless of whether there was notice of any material defects given to it by Rauch. The district court's instructions on substantial completion and full completion were not deficient in the manner suggested by Rauch.

### E. Admission of the Goldsmith Report

■ Rauch's final assertion of error in the jury proceeding concerns the district court's exclusion of a document referred to as the Goldsmith Report. Goldsmith was an architect employed by Ramada in 1974 to study the defects that Rauch had alleged at that time. Rauch claims that he sought to introduce this report as "a part of his case in chief," because it confirmed the majority of the alleged defects. The district court heard testimony regarding the origins of the report and concluded that it was inadmissible under Federal Rule of Evidence 408 because the report was a tool used in an unsuccessful settlement attempt. Rauch contends that this ruling was in error because rule 408 does not exclude all evidence presented in settlement attempts ' and there was the lack of any pre-trial understanding that the report could not be used in evidence. Rauch's claim of error is without merit.

Rule 408 provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. *Evidence of conduct or statements made in compromise negotiations is likewise not admissible.* This rule does

not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed.R.Evid. 408 (emphasis added.) This rule is designed to encourage settlements by fostering free and full discussion of the issues. The previous common law rule held that admissions of fact made in negotiations were admissible "unless hypothetical, stated to be 'without prejudice,' or so connected with the offer as to be inseparable from it." *Advisory Committee Notes*, 28 U.S.C.A. Federal Rules of Evidence, rule 408. After the House Committee rejected a proposed deviation from the common law rule, the Senate Committee amended the proposed rule, by inclusion of the language emphasized in the above quote, because

The real impact of this [House] amendment however, is to deprive the rule of much of its salutary effect. The exception for factual admissions was believed by the Advisory Committee to hamper free communication between parties and thus to constitute an unjustifiable restraint upon efforts to negotiate settlements—the encouragement of which is the purpose of the rule. Further, by protecting hypothetically phrased statements, it constituted a preference for the sophisticated, and a trap for the unwary.

S.Rep.No. 1277, 93d Cong., 2d Sess., *reprinted in* [1974] U.S. Code Cong. & Ad. News 7051, 7057. The present rule fosters free discussion in connection with such negotiations and eliminates the need to determine whether the statement if not expressly qualified "falls within or without the protected area of compromise;" the question under the rule is "whether the statements or conduct were intended to be part of the negotiations toward compromise." 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 408[03], at 408–20 to –21 (1980).

The rule does not indicate that there must be a pre-trial understanding or agreement between the parties regarding the nature of the report. Indeed, Rauch's assertions in this regard would partially revive the common law rule that a party assert that his statement is made "without prejudice."

The Goldsmith Report, thus, appears to fit squarely within the exclusionary scope of rule 408. The only indication given by the parties of the report's origins, is the testimony of Leonard Gilbert whose testimony can only be construed as supporting the position that Goldsmith was commissioned by Ramada to prepare a report that would function as a basis of settlement negotiations regarding the alleged defects in the motel. The report was to identify arguable defects that could then be discussed in monetary terms in the negotiations.[8] The Goldsmith Report, as described by Mr. Gilbert, thus represents a collection of statements made in the course of an effort to compromise, and the district court properly held it inadmissible under the main provision of rule 408.

Rauch raises numerous reasons why the Goldsmith Report is admissible under the exceptions in rule 408. First, he argues that the report falls into the exception to rule 408 which holds that the rule "does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations." This sentence was intended to prevent one from being able to "immunize from admissibility documents otherwise discoverable merely by offering them in a compromise negotiation." S.Rep.No. 1277, 93d Cong, 2d Sess., *reprinted in* [1974] U.S. Code Cong. & Ad. News 7051, 7057. Clearly such an exception does not cover the present case where the document, or statement, would not have existed but for the negotiations, hence the negotiations are not being used as a device to thwart discovery by making existing documents unreachable. Second, Rauch contends that the report was not only offered to prove the existence of defect but also to prove Ramada's notice of the alleged defects. Rule 408 "does not require exclusion when the evidence is offered for another purpose [other than proving the existence of defects]," but this provision, surely, was not intended to completely undercut the policy behind the rule. *See* 2 J. Weinstein & M. Berger, *supra*, ¶ 408[05], at 408–25 to –26 (court "should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations"). This Court, in a pre-rules case, recognized that this exception, as codified in rule 408, must be balanced against the policy of encouraging settlements and the district court's judgment in this regard will be upset only for abuse of discretion. *See Reichenbach v. Smith*, 528 F.2d 1072 (5th Cir. 1976). *See also John McShain, Inc. v. Cessna Aircraft Co.*, 563 F.2d 632 (3d Cir. 1977). We cannot say that the district court abused its discretion; notice could be effectively proved by means less in conflict with the policy behind rule 408.[9] The exclusion of the Goldsmith Report under rule 408 must stand.[10]

8. Without explanation or citation of the transcript, Rauch contends that Gilbert "acknowledged that the report had a 'dual purpose,' only one purpose being its use in settlement discussions." Our reading of Gilbert's testimony reveals no such statement. The closest statement to its effect was quoted by Ramada.

> Mr. Adkins: All right. Then you're saying that Goldsmith's report, defendant's exhibit S for identification, was priced out as it were for the purpose of trying to settle in January '75?
>
> Mr. Gilbert: Yes. Part of it was that. Part of it was to determine whether or not some of these complaints were justified. Those that were supposedly justified or justifiable or you could even argue about, they were supposed to put a price on.

And this remark does not aid Rauch, because, to the extent the answer is responsive to the question, it refers to the dual functions that the report played within the settlement negotiations, rather than a second function, totally apart from the negotiations. Read in context with the remainder of Gilbert's testimony this remark clearly was not a departure from his assertion that the report was prepared for use in the settlement negotiations.

9. For example, the Court exhibits contain a series of letters dated in October, 1974 between

10. See note 10 on page 1108.

## II. *Foreclosure*

After the jury rendered its verdict for Rauch, the district court, in an Order of Final Decree of Foreclosure, dated November 6, 1978, found that "prior to commencement of this action, Plaintiff filed a contractor's affidavit on February 11, 1975 in the form prescribed by law." Rauch's appellate counsel recognized a facial error in that statement because Rauch's complaint was filed on January 31, 1975, several days *before* the affidavit was supposedly "filed." Rauch thus contended that the foreclosure order was invalid because Ramada had failed to comply with Florida lien law that

counsel for both sides, referring to a list of complaints given to Goldsmith apparently at approximately the same time. These letters accompanied by the list which was not included in the exhibit could have proved this notice issue without prejudice to Ramada.

10. Rauch in his reply brief questions for the first time the applicability of the Federal Rules of Evidence to this case. He argues that because this action was commenced prior to July 2, 1975 the Federal Rules of Evidence do not apply where this application "would work injustice." Pub.L.No. 93–595, § 1, 88 Stat. 1926. The "injustice," Rauch argues, arises because there was no understanding that the admissibility of the report would be challenged and he was surprised when at trial Ramada invoked rule 408 to oppose its introduction. Rauch's argument on the applicability of the Federal Rules of Evidence is fully answered by his concession in the Pre Trial Stipulation that "the Federal Rules of Evidence . . . apply." Rauch, by that action, has lost his right to claim an injustice from the application of the Federal Rules of Evidence, regardless of whether he was aware that this specific objection would be raised at trial. Rauch may have been surprised by Ramada's objection, but we find insufficient grounds for reversal.

He contends that Ramada should have raised its objection to the report in the pre-trial stipulation because the local rules of the Middle District of Florida provide that the stipulation shall contain "a concise statement of any disagreement as to the application of the Federal Rules of Evidence." M.D. Fla.R. 3.06(c)(10). We have already ruled above that under rule 408, contrary to the views of both trial and appellate counsel for Rauch, there need not be an understanding or agreement as to the nature of the report. Rauch now contends on appeal that local rules of procedure also mandate that Ramada have raised its rule 408 objection prior to trial. There are flaws in Rauch's argument. First, local rule 3.06(c)(10), contrary to Rauch's interpretation only requires the parties to specify if the Federal Rules of Evidence apply—it does not require specific objections to be noted to proposed exhibits. Rule 3.06(c)(4), a provision ignored by both sides, does provide that the stipulation include "a list of all exhibits to be offered at trial, with notations of all objections thereto." Rauch did list the Goldsmith Report as an exhibit in the Pretrial Stipulation

of April 18, 1977 and Ramada does not claim it raised an objection at that time. But if Rauch cannot properly articulate the district court's error on appeal it is doubtful that he gave the district court an opportunity to consider this issue under local rule 3.06(c)(4). Indeed, Rauch apparently never raised this objection at trial. He cites no portion of the record where he made such an objection grounded on local rules. Our examination of portions of the record reveals that his trial counsel's arguments in the district court question only whether a failure to object earlier waived protection under rule 408. In addition, Rauch cites no other authority for his contention that Rauch cannot raise a rule 408 challenge to evidence that it had not challenged before trial. We do not believe that the district court committed plain error in failing to consider Rauch's compliance with local court rules when that issue was not raised by Rauch's trial counsel. *See generally* Fed.R.Evid. 103(a)(1), (d).

The crux of Rauch's objections must be that he would not have stipulated to the application of the Federal Rules of Evidence had he known that Ramada would invoke one of the Rules against him. This is a combination of his argument that the Rules of Evidence do not apply and that Ramada failed to comply with the local rules. His discussion of this matter, however, begins and ends with the last footnote in his reply brief where in toto he states that:

We acknowledge that the parties agreed in the pretrial stipulation that the Federal Rules of Evidence would apply. But the present issue had not even surfaced at that time, a circumstance which can only be attributed to Ramada.

The difficulty we have with this argument, aside from its tardiness, is the failure of Rauch to fully develop it. For example, he does not demonstrate the nexus between his stipulation regarding the Rules of Evidence and Ramada's failure to comply with the local rules. He presents no authority, other than the local rules, which would compel Ramada to give advance notice of its objection to the Goldsmith Report. But he does not demonstrate that an advance challenge to the report, including compliance with local rule 3.06(a)(4), would have revealed the rule 408 issue in a way that would have altered Rauch's stipulation. Specifically, he does not show that a bare objection to the admissibility of the report would not have satisfied rule 3.06(c)(4).

prescribes that a plaintiff has no action to foreclose such a lien unless the affidavit is delivered to the owner at least five days prior to the commencement of such action. *See* Fla.Stat. § 713.06(3)(d)1.

Faced with this appeal, Ramada, with leave from this Court, moved the district court for correction of the final order. *See generally* Fed.R.Civ.P. 60. On February 5, 1980, the district court then granted Rauch's motion and held that neither party had previously made an issue of the compliance with the delivery requirement and, in any event, the affidavit was delivered at least five days prior to the commencement of this suit. Rauch now continues his challenge to the district court's findings regarding compliance with the delivery requirements. He alleges that the district court's finding is supported by no evidence and accordingly must be reversed as clearly erroneous. We agree that a review of the evidence reveals not a hint of the delivery date of the affidavit. But we believe that a more appropriate remedy than a mere reversal is a remand with instructions and structure our mandate accordingly.

 The five-day delivery requirement is far from insignificant to the Florida courts. Failure to allege service of the affidavit, as required, results in a dismissal of the claim upon motion. *Falovitch v. Gunn & Gunn Constr. Co.*, 348 So.2d 560 (Fla.Dist.Ct.App.1977). The party seeking to enforce the lien has the burden of pleading and proving compliance with the statute. *Atlantic Gardens Landscaping, Inc. v. Boca Raton Land Development, Inc.*, 360 So.2d 1278 (Fla.Dist.Ct.App.1978). If the affidavit has not been timely delivered a dismissal without leave to amend is proper even if the affidavit was, in fact, delivered, because amendment would be futile. *Mardan Kitchen Cabinets, Inc. v. Bruns*, 312 So.2d 769 (Fla.Dist.Ct.App.1975).[11]

The process of litigating the lien issue began in normal fashion in this case. In its complaint Ramada alleged in Paragraph 11 of Count I that it had "pursuant to Chapter 713 of the Florida Statutes, furnished to the Owner at least five (5) days prior to the filing of this action the required sworn statement of the Contractor." Rauch in his answer denied the assertions in Paragraph 11 of Count I, and also raised noncompliance with the Florida statute as an affirmative defense. The First Pretrial Stipulation dated April 18, 1977, and the Second Pretrial Stipulation filed on February 2, 1978, fail to mention any agreement or disagreement regarding the date upon which Rauch was served with the affidavit. At trial, Ramada introduced into evidence Plaintiff's Exhibit 14, a contractor's affidavit executed to comply with the Florida lien law.

> MR. ADKINS: We have the contractor's affidavit, which is by statute required to be filed [sic] not less than five days before commencing this action, which we would like to offer for the sole and only limited purpose of showing that we did so, and not to prove the truth of the matter shown thereon.
>
> That is Exhibit 14 which, as the Court will see, has a number of lien claims of subcontractors on it, all of which I have advised opposing counsel long ago—and of course, now advise the Court, as I think probably you know—have been extinguished by settlement.
>
> So I think that's procedural only, Your Honor, and it merely is perfecting the action. It need not go to the jury, anyway. But I offer it only for that limited purpose. . . .
>
> ⋅ ⋅ ⋅ ⋅ ⋅
>
> [The Court:] ... My understanding is that Plaintiff offers Exhibit Number 14 for the sole purpose of showing or, at least, constituting evidence of compliance with the applicable provision of the mechanic's lien law. is that—
>
> MR. ADKINS: That's correct.

---

11. If the complaint was defective for failure to allege delivery in compliance with the statute, but it was possible that compliance occurred, a "motion to dismiss for failure to state a cause of action should have been granted, *with leave to amend.*" *Stern v. Perma Stress, Inc.*, 134 So.2d 509, 512 (Fla.Dist.Ct.App.1961) (emphasis added).

Although the exhibit on its face shows an execution date of January 17, 1975, Rauch, reading from a copy, testified that it bore a date of February 11, 1975, and that, therefore, he must have received it sometime after that later date. Neither party indicates that any further events transpired at trial that concerned the delivery date of the affidavit.

 Under these circumstances, it is beyond question that *no* evidence supports the district court's finding that the affidavit was delivered at least five days prior to the commencement of this lawsuit on January 31, 1975. Ramada asserts in its brief that the *"sole* competent evidence in the record concerning the delivery date of the affidavit is the *affidavit itself* received in evi-

dence as Px. 14 and Dx.R." (emphasis in original.)[12] But the affidavit in no manner indicates the date upon which the affidavit was served on Rauch.[13] Therefore, the district court had no evidence of compliance with the timely delivery requirement and the district court's finding of compliance is clearly erroneous.[14]

Despite the insufficiency of the evidence of date of delivery, Ramada argues that the failure to include the issue in the Pretrial Stipulation relieves Ramada of its burden to prove at trial timely delivery of the affidavit (citing *Funding Systems Leasing Corp. v. Pugh*, 530 F.2d 91, 95 (5th Cir. 1976). On the contrary, *Pugh's* suggestion that the pretrial order supersedes the pleadings was clearly more fully explained by the

---

**12.** Ramada also relies upon various matters not in the record. First, it baldly claims that the parties "agreed or understood" that no proof on this issue would be required. But Ramada never cites any portion of the record in support of such agreement. Second, Ramada discusses various actions by Rauch that confirm its assertion of an agreement. But Rauch's statement in his trial brief that the affidavit was "not furnished until January of 1975," Ramada admits, is not binding on Rauch and, in any event, this statement does not establish delivery five days prior to January 31, 1975. And Rauch's failure to raise this issue in motions for dismissal, directed verdict, or new trial, Ramada admits, does not foreclose this issue on appeal. These actions may indirectly confirm the existence of an agreement but Ramada must first introduce more direct evidence that such agreement existed. Third, the lack of comment, regarding the sufficiency of the affidavit when the document was offered in evidence, is also offered as confirming Rauch's position. But the failure of Rauch's counsel to object to the affidavit adds no weight to the document's evidentiary value as proof of date of delivery. Ramada's contentions in this regard are without merit because it has not specified any part of the record that shows positively that there indeed was an agreement or understanding on this issue.

**13.** From Rauch's testimony it is clear only that he received the document at approximately the time when the suit began.

**14.** We are aware that one Florida court has expressed an opinion that might be read as support for a conclusion contrary to that reached by this Court. That opinion reads in pertinent part:

> Appellant, Vaughan primarily argues that a mechanic's lien should not have been impressed against his property because there was no proof that an affidavit had been *served* upon him pursuant to Section 713.-06(3)(d)(1), Florida Statutes (1975).
>
> In addition to previously furnishing appellant with 21 progress payment affidavits pursuant to Section 713.06(3)(d)(1), Florida Statutes (1975), on August 30, 1974 appellee Art Construction *executed* an affidavit with a list of all debts outstanding to secure final payment from appellant. Therefore, the record is sufficient to support the conclusion that appellee complied with Section 713.-06(3)(d)(1), Florida Statutes (1975). *See R. F. Driggers Construction Co. v. Bagli*, 313 So.2d 450 (Fla.2d DCA 1975). We also note that appellee after introduction of the August 30, 1974 affidavit at the trial, moved to amend the complaint to show that the required affidavit was furnished; however, the trial judge did not feel the amendment was necessary since appellee had proved it *filed* the affidavit. Thus, this point of appellant must fail.

*Vaughan v. Art Construction Co.*, 341 So.2d 823, 824 (Fla.Dist.Ct.App.1977) (emphasis added.) This language could be used as approving the date of *execution* as evidence of the *delivery* of the affidavit. The *Vaughan* court, however, did not specify whether the appellant specifically questioned the timeliness of the delivery and, in any event, the appellee in *Vaughan* evidently "proved that it filed the affidavit" a fact not raised by the parties in this case. Because proof of execution of an affidavit in no manner shows that it was ever delivered, we believe that additional evidence, either testamentary or documentary, is required to prove the actual date of delivery.

court's subsequent statement that one with the burden of proof on an affirmative defense, who fails to include the issue in the pretrial order, may by that failure waive appellate review on that issue. *Id.* at 95. This principle coincides with the Court's statement in *Pacific Indemnity Co. v. Broward County,* 465 F.2d 99, 103–04 (5th Cir. 1972), that a failure to indicate in the pretrial order that an issue remains for trial ordinarily precludes proof on such issue to the detriment of the party who bears the burden of proof.[15] Ramada does not deny that under Florida law it bears the burden of proof on this issue. Therefore, Ramada's argument on this point must fail. We find more on point another statement, in *Pacific Indemnity,* that a party who has specifically denied an issue upon which opponent has the burden of proof, does not waive or admit the issue by failing to include the issue in the pretrial stipulation list of issues. *Id.* at 103. *See generally* Fed.R.Civ.P. 16. Although the present case differs slightly from *Pacific Indemnity* [16] we think the latter as a "forgotten issue" case controls our decision.

Our finding of error does not result in a mere reversal of the district court's finding. Ordinarily a failure of proof is fatal. But in this instance the circumstances and fairness call for a different result. Because Rauch does not claim to have raised this question in a motion before the district court where Ramada could have remedied the defect, and because Florida law may have led the parties and district court to believe that the proof offered was sufficient, *see* note 14 *supra,* we exercise our power to remand to the district court for the opportunity to take new evidence on this issue and the making of whatever finding is correct in light of such evidence as may be properly presented.[17] *See* 28 U.S. C.A. § 2106 (West 1959); *Youngstown Sheet & Tube Co. v. Lucey Products Co.,* 403 F.2d 135, 139–40 (5th Cir. 1968). This disposition seems just where the issue was in good faith apparently treated as a non-issue [18] by *both* sides in the district court and raised only before this Court.

## CONCLUSION

The judgment of the district court is affirmed in part and reversed in part. The district court's actions did not result in reversible error with regard to the questions decided by the jury. The district court's subsequent finding that the contractor's affidavit was filed at least five days prior to the commencement of this action is reversed and this case is remanded for further proceedings dealing with this question.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED WITH INSTRUCTIONS.

---

**15.** Neither side has raised the applicability of this rule to the present case. We, therefore, do not address the question.

**16.** Ramada points out that Rauch not only denied timely delivery but raised it as an affirmative defense. Given the denial, the defense was merely superfluous. Similarly, we think the district court's conclusion that Rauch waived this issue to be no distinction from *Pacific Indemnity* where Ramada cites neither authority nor the record in support of the finding of such a waiver. *See* note 12 *supra.*

**17.** Rauch also raises questions concerning such matters as interest and attorneys fees which

Rauch claims are subject to reversal if the lien is declared invalid. Any disposition of most of these issues must await the district court's decision on remand. In addition, we think it wise to reserve judgment on Rauch's claim that the district court awarded interest from too early a date, because the issue may be affected by the district court's decision.

**18.** Ramada claims that there was an agreement between counsel regarding this issue and, without passing on the validity of such agreement, we can see no reason to prevent Ramada from attempting to prove its existence.